Madam Clerk, please call the next case. 213-1178, Stephen Kluber v. Preferred Election Counsel, you may proceed. It pleases the Court, Raymond Simard on behalf of the claimant Stephen Kluber. Once again, the lead issue is whether the award of the commission is contrary to the manifest weight of the evidence. In this case, we have an award of the loss of use of the man as a whole under Section 8D2. The claimant argues that the commission should have awarded a wage differential under Section 8D1. In the Gallianetti case cited in my brief, this Court stated that the word shall in Section 8D prohibits the commission from awarding an award for the man as a whole when a claimant has presented sufficient evidence to show a loss of earning capacity. That the word shall in the statute does not leave the commission with any discretion. In Gallianetti, this Court reversed the decision of the commission on a manifest weight issue. So the inquiry for this Court then becomes, did the claimant prove entitlement to a wage differential? There are two things that he has to do. The first one is really not in dispute. He showed a partial incapacity that prevents him from his usual and customary line of employment. The next one is whether he showed an impairment of earnings. Piles, the union business agent, testified that the claimant would be earning $43.56 per hour in the full performance of his duties, working a 40-hour week or at least scheduled for a 40-hour week. Ormsby, the only certified vocational rehabilitation counselor that ever met with the claimant, stated that he could perform a minimum wage job at best. If we don't accept your notion of certified versus non-certified, these are the opinions of Ormsby versus Bose. Bose did testify that he was employable at a range of $14.38 to $16.38 an hour, didn't she? Among other things, Justice Hoffman, she testified. She first said he could earn $23.73 to $25.70. That's correct. And then he never got any offers at that range. And then she stated that based on the survey that was conducted, she found that he was Yes. So at least there is evidence in the record of a diminution in earning power. The question is, what number do you pick? Yes, and if I may continue, I'll suggest one. She testified that she identified jobs in the $23.75 to $25.75 an hour job, a job and a pay rate, and she couldn't find one. And then she went down to the range you just stated and she couldn't find one. And you go back to the first hearing where the arbitrator pointed out he made 658 job contacts and he only received one interview, that one being the dishwasher job at Steak and Shake that paid $9.25 an hour. And Bose testified that she felt that was an appropriate job placement for the claimant, as did Diamond Warren, the job placement person, which is at or near the minimum wage. I think we have the number that we need here. The arbitrator at the 19B hearing, Arbitrator Kinnaman, pointed out the 658 job contacts, which generated one interview. And he didn't go to the interview, and that's disputed as to why. But the arbitrator on either side reviewed her decision and said vocational rehabilitation has run its course. What's happened? We started from 23 to 25. That didn't work. We expanded, I think that was Bose's word, down to the lower rate. And then finally she gets him a job as a dishwasher, and she testifies that's an appropriate placement. Now, how much did he earn as a dishwasher? Nine something. Nine and a quarter. $9.25 an hour. Yes. And she said, Bose said it was appropriate. She said it was appropriate. I quoted the page in my brief. So your argument is entitled a wage differential between $9.25 an hour and, what did you say, 43? 43.56. 43.56. How many hours should he get that for? A week. The dishwashing job was full time, and Piles testified that our electricians are scheduled for 40 hours. That's the full performance of their usual and customary duties. But he never worked that long. No, that's where this case gets a little messy, because the commission entered an award under Section 8D2, and they sort of threw in some findings as to what he would be earning in the full performance of his job. Now, if they're awarding 8D2, they don't have to make those, have that language in the decision. And I pointed out the Forest City Erector's case where you don't look at that. Full performance means whatever, how many hours he's scheduled for, and that's 40 hours per week. So that's why I'm arguing that it should be 43.56 times 40 hours per week. So you're saying being scheduled for is the same as earning. The cases that have interpreted Section 8D1 of the Act state don't look at how many hours he actually worked. They look at full performance. What would he be earning in the full performance of his duties? And that, I believe, is the Forest City Erector's case, which I've cited. And those cases say he's normally scheduled for 40 hours. Sure, he loses time because of layoffs and weather. But if he's normally scheduled for 40 hours, full performance of his duties is 40 times his hourly rate. I can move on to the other issues. I move to strike the testimony of Bethel and Warren. 8A specifically says that they shall have all vocational rehabilitation counselors who render opinions shall have appropriate certifications. Do they render opinions? Or did Bose render opinions? Bose rendered an opinion. I'll get to my next issue then. No, no, no. Don't get your next issue. Let's stay on this issue. Did they ever render an opinion? Bethel did. She did the initial vocational. Well, what opinion did she render in this case? What opinion did she render and what opinion did anyone rely on? Well, she rendered opinions as to what would be an appropriate course of vocation. She did a report and Bose rendered the opinion. That's true. Okay. So she rendered no opinion. So we don't have a violation. The question is, can a certified rehabilitation counselor employ non-certified people to conduct reports, conduct surveys? Why not? Did they say they can't? Any more? I would the language of the statute that I have a problem with is Warren really did all the job searches. Of course, she reports to Bose once a week. But the act says you have to be certified to counsel for job searches, supervise a job search. I guess it's how loosely you want to interpret supervise. Well, I mean, let me ask you a question. You practice law and you hire some people who practice law hire clerks. They're not lawyers. And they do legal research and they write things for you. And then you give an opinion to a client. Should somebody say that the clerk practiced law without a license because you relied on their research? I wouldn't think so. That's a good point. But why should a vocational rehabilitation expert's opinion be attacked merely because non-certified people did the reports upon which they based their opinions? There's going to your analogy, section 8A of the act says they shall have appropriate certification. Who's they? Who's the they? The vocational rehabilitation counsel. It does what? It renders opinions, counsels for job searches. Hold on. Renders opinions. Now, we know that they didn't render any opinions. Did they give him any counseling as to job searches? Did they tell him where to go or did Bose tell him? They did. Warren basically did everything on the job search and Bose reviews her work once a week, said she has a meeting. Sure. After the fact. So, I mean, it occurs to me that these people are nothing more than researchers. They're not the ones doing the counseling and they're not the ones rendering the opinions. And it's really Bose's opinion you've got to attack in order to get at their evidence. All right. Well, let me attack Bose's opinions. But Bose is, in fact, a certified counselor. You don't dispute that, do you? No, I do not. And she never met with the claimant. But you don't really want to attack Bose's opinion, do you? Because she said $9.25 an hour was an adequate wage, right? Yeah. And you didn't have any other evidence? I'm sorry? You didn't have any other evidence as to $9.25 other than her, did you? I had Olmstead who said minimum wage was $8.25, I believe. Yeah. So you want to argue about $8.25 to $9.25? Yeah. I did the math. We'd have to go up to $12 before it made any difference. Yeah, exactly. Okay. All right. Well, we have to establish some impairment of earnings, right? Yes. So you've got both of them say there's impaired earnings, right? That's correct. Okay. And you're trying to get an 8D1? Absolutely. Okay. But you're relying on the Steak and Shake job that he never worked. He wasn't ever hired for that job because he refused to interview for the job. Yeah, that's correct. And didn't the commission cite that as to a reason? I mean, it's not like they ignored the wage differential. They gave the reasons why they didn't award a wage differential, right? Yeah, but he doesn't have to work in order to get it, does he? That's correct. That's not what 8D1 says. It says or is able to earn in some suitable employment or business after the accident. He is able to earn. Either he is earning or he is able to earn. Well, he wasn't earning anything. That's right. But he's capable of earning $9.25 an hour, according to Bose, or $8.25 an hour, according to Ornsby. That is my argument. And that's your argument? He's entitled to a wage differential between that and what he would have been working in a 40-hour week as an electrician? That's correct. Is it your understanding, I mean, what the commission said was we can't determine what he could have earned because he didn't cooperate? Well. That's what they said, basically, isn't it? If he had been actually looking for a job, they didn't believe he was really trying to find a job. All of the non-cooperation language that was in the arbitration decision was stricken by the commission. I think it's the bottom of page 7 to the first paragraph of page 9 of the decision. The Gallianetti court at 731 of the opinion says there's no affirmative requirement that he conduct the job search. And in a later case, Coppenweld-Tubing, this court said that the claimant doesn't even have to be working. He doesn't have to be working. He doesn't even have to look for a job. All he's got to do is prove what he could have earned in some suitable employment as compared to what he would have been earning but for the accident. I agree. He's not required to get a job, and he's not required to look for a job. That's correct. I agree with you. Thank you. Thank you, counsel. Counsel, you may respond. May it please the court? Counsel, John Fasola on behalf of the employer of Preferred Electric Construction. Our position in this case is that the commission, as the finder of fact, was entitled to draw inferences from the fact and make determinations, and that this Court's role is not to reweigh the evidence. Okay. What inferences could the commission draw in order to deny this man a wage differential? That he didn't prove his case. And that's exactly what they found. He didn't prove his case. His witness and your witness came up with a bottom-line figure. Assume for a moment that he didn't prove the 825. You sure as heaven proved the 925. I'll take issue with that, Your Honor. I think that's not an accurate. Should you testify to that? What she testified to, she was asked, because you sent him to go to that interview, which, by the way, he didn't go to, because you sent it to him, does that mean that that would have been an appropriate placement for him? Sure, it would have been an appropriate placement, but that was not the limit of what his earnings could have been. The only way you could determine what the limit of his earnings would have been would be if he would have given a full and complete effort in his vocational process and not had his benefits terminated as a result of giving a sham effort. That was what the first hearing. As much as Mr. Simard would like to say that's not what Arbitrator Kinnaman decided, he did decide it. Didn't she render opinions as to what this man was capable of earning, even though he didn't cooperate at all, once $25 an hour, another time $14 an hour? What she testified to specifically is that she did a labor market survey. And when she did two different labor market surveys, she found a range of wages of different employers that were representative employers in the market in which he could potentially be. Okay. But then he doesn't go out and make an attempt. And I realize that's not what 8D1 says. Right. But it says that which he is able to earn in some suitable employment or business after the accident. She testified as to what a suitable employment or occupation was. And she also testified as to how much she could earn in it. She disagreed with Ormsby because Ormsby didn't take any of the they disagreed as to how heavy labor he could do. And she disagreed with Ormsby. So let's assume that she's correct as to the employment that he could obtain. The fact that he doesn't cooperate or he doesn't go out and look for the jobs doesn't change her opinions. But under that scenario, as soon as he goes to White Hen Pantry or Subway or any job that's minimum wage and pulls an application, that means that there's established the bottom wage. No. The qualifying wage. What it means is that when there's evidence in the record that says this job is suitable for him, he could do this job based upon his physical restrictions and it pays X number of dollars, they've now established the bottom number. We know the top number. To quibble with you, Your Honor, the evidence that's in the record and the evidence that the commission accepted and the evidence that the commission was entitled to accept was testimony from Julie Bowes that his lack of full effort precluded the ability to determine appropriate measuring wage, that it would be impossible to determine the wage that he would be capable of earning if he did not perform a complete and unbiased and non-sabotaged, quite frankly, job. So you're saying the burden doesn't shift on you until that is done. Of course it doesn't. Exactly. And that's essentially, Gaglianetti doesn't state otherwise. Gaglianetti still sets forth that the Petitioner or the claimant bears the burden of proof, that they have to prove both that he was unable to return to work as in the prior employment, and Gaglianetti in that case did that, showing that he was not able to return to work as a tree trimmer, as those facts were, and also that he was able to establish a measuring wage on which to calculate the wage differential award. And then Gaglianetti. What kind of wage? Pardon? I'm sorry. The measuring wage. The measuring wage. So what's called the bottom wage, the measuring wage. And here there was no measuring wage. Measuring wage what? Because he didn't give a complete effort in which would have allowed him to present credible evidence of what the wage would have been that he would have been capable of earning. Otherwise, I mean, you're gaming the system otherwise, quite frankly. Where does it end? I mean, if you allow a claimant to miss one interview or five interviews or ten interviews and they go through the motions and they, you know, oh, my expert says that I could get minimum wage, that's sufficient? Are we really saying that you can sabotage it? No, counsel, your argument would bear a lot of weight if what he had done was not cooperated with the FTC. Then we turn around and say, wait a minute. He fudged on his capability, and therefore he's introduced no evidence as to what he's capable of working because he lied about what he's capable of doing. But he did fudge on his capabilities. No, wait a minute. But Bowes didn't buy Ormsby's theory. Bowes turned around and said that he was capable of performing at a higher level of labor than Ormsby suggested. But then she still came up with an opinion as to how much he could earn. Now, whether he actually ever earns that amount of money is really under irrelevant under Gallagher's netting. The real question is, what is he capable of earning? Now, what she said was that she was not capable of rendering an opinion as to what he would be able to earn because he had not participated. No, that was later. Where did the $25 an hour come from? Pardon? Where did the $25 an hour number come from? I mean, there were different numbers that were raised in our labor market surveys as potential employments when she looked at the labor market, what a qualified individual with the same type of credentials that Mr. Kluber had could be capable of earning. Based on the results of her survey, she opined that a claimant was a candidate, quote, candidate for positions like estimator, builder, electrical material order, or electrical supply house, and that he could anticipate a wage of approximately $23.73 to $25.73 an hour. Sound like an opinion to you? But she also. Yes or no? Yes, but she also went on to determine. I'm going to go further. Later, she decided to expand her search to look for other types of positions, noting that he had not yet been offered employment and the expansion of his job search was appropriate. She then, MedVet conducts a second labor survey in June of 2011 due to the expanding job search. She testified that she reviews all of the labor market survey information and agreed with the report's contents. She stated the survey found a claimant capable of employment with a range of $14.38 to $16.38 an hour. Sounds like another opinion to me. Your Honor, of the jobs that were identified specifically in the labor market survey, which she also testified is not representative of the entire labor market, which she also testified included employers who had other jobs that she was not able to determine a wage, then under your theory, Your Honor, if you do a labor market survey or if a representative does a labor market survey and finds a job at $8.25 and finds another job at $11.25, which number, what's her opinion? Is it $8.25 or is it $11.25? What would you set as a measuring wage in that instance? Well, it says here in E21, he is able to earn in some suitable employment. We don't know that. So able is the top number. We don't know what he's able to earn in some suitable employment. No, she gave an opinion. Excuse me. Stop, stop, stop. She gave an opinion as to what he was able to earn and you can't deny it. She gave it twice. She gave an opinion, her exact opinion, Your Honor, and if you read the testimony in the totality, which I would urge you to do, says it would be impossible to accurately determine the wage he could potentially be earning because he did not participate in good faith in a job search. And the arbitrator determined that, made that specific determination. Except one problem. She is still stuck with her opinion and she's your expert. If you didn't want her to testify to a rate breach, you turned it to her not to. She did. 2373 to 2573, revised to 1438 to 1638. Now, what his potential for earning may or may not be, may relate to some issues other than this, but that's not what 8D1 requires. He is able to earn in some suitable employment. Whether he did it, didn't do it, went for it, or didn't go for it, the question is, is there enough evidence in the record to establish what he's able to earn in a suitable employment? And if the commission says that it's not in this record, somebody's got to explain what we do with Boza's opinions. Boza's opinion, and I'm sorry to keep on arguing that. I know. You keep repeating the same thing. Because it's true. That's her core opinion. That's the opinion she testified to. That's her labor opinion. The numbers that you're citing, Your Honor, with all due respect, are from a labor market server where she identified that there are potentially employers out there that pay these rates to a qualified individual. That's not an opinion that Mr. Kluber specifically was capable of earning those wages. But wait a minute. She said, and I'll quote again, was a candidate for positions like estimator bidder, electrical material order for supply house, and that he could anticipate this wage rate. He's a candidate for it. She's not going to say he's a candidate if he's not qualified. He is a candidate for that. I agree with that. But as to what his wage would have been or could have been, or her opinion as to what an appropriate quote, unquote, measuring wage would be for him, she deemed, and her opinion was that he was not capable of being determined. You're saying we have to look at the final qualifying language. You said this could be this, it could be that, but I can't give you a firm opinion because he didn't cooperate. Absolutely. You're saying that's not a firm opinion. Correct. And that's for us to determine if it is or it isn't. You can go back and forth all afternoon on this. Correct. And in fact, we sort of are. And whose burden is it to establish the measuring wage? It's absolutely the Petitioner's burden of establishing the measuring wage. There's no doubt about that. And the Commission was entitled to weigh both the opinion of Ms. Bowes and the opinion of Ms. Ormsby, give them the due weight that they felt was attached to those opinions and make a determination, and that's entitled to respect by this body. Well, counsel, your argument has a certain intuitive appeal, but there's no reason why the Commission can't depend on your expert's testimony to supply the measuring wage, right? Theoretically, they could have. They did not necessarily do that in this case. They're entitled to look at all the evidence produced in the case and decide the case based on all the evidence regardless of who produced it, right? Correct. Correct. If we find it to be an opinion. Correct. They could have found that. I don't believe that that's what they found in this particular case. Thank you, Your Honor. Thank you, counsel. Counsel, five minutes in reply. Thank you. Very briefly, the only thing that counsel said that I take exception with is that  Boes specifically testified, record on appeal pages 1261 to 1262, that Mr. Kluber was compliant from March 10th to, I'm sorry, August 10th, 2010 to March 29th, 2011, and that's when the stake-and-shake business begins, and it's during that period of time that she was trying to price him in the $23-an-hour jobs and even the 14- and 15-hour jobs. At the end of the day, the only interview that she found for him, the only job which she said was an appropriate placement for him, a specific job with a specific name and a specific pay, was the stake-and-shake job paying $9.25 an hour. Thank you. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement that a written disposition shall issue. The court will stand at brief recess.